# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MALT FAMILY TRUST and TIMOTHY JAMES O'NEIL-DUNNE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2022-0652-MTZ |
| 777 PARTNERS LLC, PHOENICIA LLC, STEVEN W. PASKO, JOSHUA WANDER, and ADAM WEISS, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: June 6, 2023
Date Decided: November 13, 2023

Catherine A. Gaul, Michael J. Vail, ASHBY & GEDDES, P.A., Wilmington, Delaware; David W. Affeld, Edward E. Johnson, AFFELD GRIVAKES LLP, Los Angeles, California, *Attorneys for Plaintiffs MALT Family Trust and Timothy James O'Neil-Dunne.*

William E. Manning, Jessica M. Jones, Michelle C. Streifthau-Livizos, SAUL EWING LLP, Wilmington, Delaware, *Attorneys for Defendants 777 Partners LLC, Phoenicia LLC, Steven W. Pasko, Joshua Wander, and Adam Weiss*.

**ZURN, Vice Chancellor.**

After approximately ten months of negotiations, plaintiffs Timothy O'Neil-Dunne and  MALT Family Trust ("MALT," and together "Plaintiffs"), as well as nonparties to this action, entered into a stock purchase agreement to sell all outstanding equity in two entities in the aviation business to an affiliate of defendant 777 Partners LLC (the "SPA").  In return, the sellers would receive cash, and MALT would receive vested and unvested equity in Phoenicia LLC, a newly formed LLC ("Phoenicia" or the "Company").  They also entered into two related agreements: Phoenicia's operating agreement (the "Operating Agreement"), and an employment agreement between O'Neil-Dunne and 777 Partners (the "Employment Agreement").

Years passed quietly.  Then Plaintiffs learned their SPA counterparties and fellow Phoenicia members entered two new business lines related to aircraft leasing.  Plaintiffs allege they understood, and the relevant agreements provided that, any such business would be conducted exclusively through Phoenicia.  Believing they were entitled to a share of these new ventures, Plaintiffs filed this action.

Plaintiffs seek to hold the defendants to Plaintiffs' alleged understanding that all the defendants' aviation-related business would be conducted exclusively through Phoenicia.  Plaintiffs' Verified Amended Complaint (the "Amended Complaint") asserts claims for fraudulent inducement, breaches of the SPA and Operating Agreement, and breaches of fiduciary duty.  They also claim that the

1

defendants caused Phoenicia subsidiaries to enter into interested agreements, that certain defendants breached miscellaneous corporate governance provisions in the Operating Agreement, and that MALT is entitled to a larger stake in Phoenicia than a recent Schedule K-1 states it holds.

The defendants moved to dismiss. As explained below, Plaintiffs' claims meet mixed success. The motion to dismiss is granted in part.

## I.      BACKGROUND[1]

MALT "is a discretionary trust established in accordance with the laws of the Isle of Man."[2] O'Neil-Dunne is "a beneficiary of the MALT trust."[3] At least until September 2018, MALT indirectly held assets in the aviation sector.

In late 2017, Plaintiffs were approached by defendants Steven W. Pasko, Joshua Wander, Adam Weiss, and others, who proposed that defendant 777 Partners

---

[1] The facts are drawn from the Amended Complaint, the documents integral to it, and those incorporated by reference. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004). Citations in the form "DOB" refer to Defendants' Opening Brief in Support of Motion to Dismiss Amended Complaint, available at docket item ("D.I.") 20. Citations in the form "PAB" refer to Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss, available at D.I. 34. Citations in the form "DRB" refer to Defendants' Reply Brief in Support of Motion to Dismiss Amended Complaint, available at D.I. 35.

[2] D.I. 20 at Am. Compl. ¶ 11 [hereinafter "Am. Compl."].

[3] *Id.* ¶ 12.

acquire aviation- and travel-related assets from MALT.[4]  777 Partners is "a private investment firm" with "investments in more than 50 operating companies," many of which are in the aviation and travel space.[5]  Pasko and Wander founded 777 Partners and served as its managing partners at all relevant times.  Weiss is CEO of 777 Partners's "Aviation and Travel Group."[6]  I will refer to Pasko, Wander, and 777 Partners together as the "777 Partners Defendants."  I will refer to the 777 Partners Defendants and Weiss together as the "Defendants."

### A.   The Parties Enter Into A Stock Purchase Agreement And Related Agreements.

Early negotiations contemplated an all-cash transaction with a purchase price "as high as $26 million."[7]  The parties met at least twelve times between November of 2017 and August of 2018.  At some point, Plaintiffs agreed to forgo an all-cash deal and accept a mix of cash and equity in Phoenicia, a newly formed entity.

Plaintiffs allege that during the approximately ten months of negotiations, Defendants represented that all their aviation-related business would be operated

---

[4] Plaintiffs allege that 777 Partners approached them in "early 2018," but then plead that an initial meeting took place on November 28 or 29 of 2017.  Compare *id.* ¶ 47, *with id.* ¶ 51.a.  For purposes of this motion, I assume that these Defendants first approached Plaintiffs in November of 2017, and that negotiations began at that time.

[5] *Id.* ¶¶ 2–3.

[6] *Id.* ¶ 8.  The Amended Complaint does not explain how the Aviation and Travel Group fits into 777 Partners's business.

[7] *Id.* ¶ 48.

3

through that newly formed entity. The only specific statement offered as support is a portion of a June 17, 2018 email Wander sent to an unidentified recipient, which conveyed "that [the acquiring 777 Partners entity] and O'Neil-Dunne were 'a critical piece of anything 777 will do in the aviation space.'"[8]

On September 12, 777 Partners and MALT executed Phoenicia's Operating Agreement,[9] and on September 13 the parties executed the SPA.[10] The SPA contemplated that a 777 Partners affiliate would purchase all outstanding equity of two MALT affiliates.[11] As consideration, the sellers received $4,072,525 in cash.[12] Additionally, MALT received a 3% vested equity interest in Phoenicia.[13] It also received up to a 5% unvested interest, 1% of which vested annually for three years.[14]

---

[8] *Id.* ¶ 53.

[9] Am. Compl., Ex. B [hereinafter "Op. Agr."].

[10] Am. Compl., Ex. A [hereinafter "SPA"].

[11] *Id.* § 2.1. For reasons that are not clear, the Amended Complaint describes the sale as an asset transfer with MALT "and other sellers" transferring their assets to a 777 Partners affiliate. Am. Compl. ¶ 67.a. Because these allegations are contradicted by the documents attached to and incorporated by reference by the Amended Complaint, I disregard them. *See Teamsters Loc. 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at *20 (Del. Ch. Jan. 31, 2023) ("I need not credit an allegation that is unambiguously contradicted by the documents integral to the Complaint's allegations.").

[12] SPA § 3.

[13] *Id.*; Op. Agr. sched. A.

[14] SPA § 3; Op. Agr. sched. A, sched. 1. It is not clear whether MALT and O'Neil-Dunne both hold Phoenicia equity, and who was entitled to equity under the Employment Agreement. The SPA provides that MALT would receive equity as consideration for the stock purchase. SPA §§ 3, 5.1. Schedule 1 to Schedule A to the Operating Agreement provides that MALT, not O'Neil-Dunne, was awarded the aggregate 8% vested and

In connection with these agreements, O'Neil-Dunne entered into the Employment Agreement with 777 Partners.[15] If the Employment Agreement was terminated within four years, MALT forfeited 1% of its vested interest.[16]

The remaining 2% was given in the form of restricted warrants, which were "convertible . . . subject to the terms and conditions of" the Employment Agreement.[17] Under the Employment Agreement, MALT received the right to convert the warrants into a 0.5% interest each time one of four milestones were met.[18] If all four milestones were satisfied within four years, MALT could convert all its warrants for the full 2%.[19]

### B. 777 Partners And Its Affiliates Launch The Jet Leasing Business.

All was quiet from the September 2018 signing through the end of 2020. But in early 2021, 777 Partners and its affiliates entered a new aircraft leasing business

---

unvested interest in Phoenicia. And the same schedule provides that MALT would forfeit 1% of its interest if the Employment Agreement is terminated. But the Employment Agreement provides that O'Neil-Dunne was to receive a 0.5% interest in Phoenicia each time a milestone was met. DOB, Ex. A § 5(C)(ii) [hereinafter "Emp. Agr."]. The parties generally treat MALT as receiving this interest, but at times Plaintiffs suggest that O'Neil-Dunne also holds Phoenicia equity. *See, e.g.*, PAB 41 (referring to O'Neil-Dunne as a Phoenicia member). For purposes of this decision, I assume that MALT, rather than O'Neil-Dunne, asserts a right to the disputed Phoenicia equity.

[15] Emp. Agr.

[16] Op. Agr. sched. A, sched. 1.

[17] *Id.*

[18] Emp. Agr. § 5(C)(ii).

[19] *Id.* §§ 5(C)(ii)–(iii).

through which they lease aircraft from third parties and then sublease them to airlines, profiting from the markup. In March of 2021, 777 Partners and its affiliates contracted to purchase aircraft for a second line of business, through which they lease aircraft directly to airlines. 777 Partners and its affiliates purchase the aircraft at the below-market price of approximately $42 million and lease them to airlines based on the approximately $52 million fair market value. They "are expected to accumulate a net asset value of more than $1 billion in a fleet of jets."[20] I refer to these two business lines together as the "Jet Leasing Business." Plaintiffs learned of the Jet Leasing Business in March of 2021.

## C. This Litigation

Plaintiffs filed their original complaint in this action on July 26, 2022.[21] On July 31, 777 Partners sent MALT a Schedule K-1 "indicating that at the beginning of 2021, according to Phoenicia, MALT had only a 5% membership interest in Phoenicia."[22] The K-1 indicated that MALT's interest declined to 3% at the end of 2022.

Plaintiffs filed the Amended Complaint on November 11. The Amended Complaint asserts ten nominal counts encompassing at least twenty claims. The

---

[20] Am. Compl. ¶ 45.

[21] D.I. 1.

[22] Am. Compl. ¶ 116.

claims generally fall into two categories. The first category centers on Plaintiffs' alleged understanding that 777 Partners would conduct all aviation business through Phoenicia—including the Jet Leasing Business. Claims in this category include (1) Pasko and Wander, on behalf of themselves or 777 Partners, fraudulently induced MALT to enter into the Operating Agreement and MALT and O'Neil-Dunne to enter into the SPA; (2) 777 Partners and Phoenicia breached a promise, representation, or warranty in the Operating Agreement that all 777 Partners's aviation-related business would be conducted through Phoenicia; (3) in the alternative, 777 Partners and Phoenicia breached the implied covenant of good faith and fair dealing by operating the Jet Leasing Business outside Phoenicia; (4) 777 Partners breached express and implied provisions in the SPA based on the theory that a breach of the Operating Agreement results in a breach of the SPA; (5) the 777 Partners Defendants breached their fiduciary duties by usurping a Company business opportunity; (6) the 777 Partners Defendants breached their fiduciary duties by causing Phoenicia to enter into self-interested, unfair transactions; (7) the 777 Partners Defendants breached their fiduciary duty duties by grossly mismanaging Phoenicia; (8) Weiss aided and abetted the forgoing breaches of fiduciary duty; and (9) Pasko, Wander, and Weiss were unjustly enriched. The second category, a bit of a grab bag, includes a claim for breach of contract asserting that 777 Partners and Phoenicia failed to convey to MALT the full equity interest it is entitled to under the Operating

7

Agreement and SPA, and a claim for breach of certain corporate governance provisions in the Operating Agreement.

Defendants moved to dismiss under Court of Chancery Rule 12(b)(6). The parties briefed the motion, and the Court held oral argument on June 1, 2023.[23] Plaintiffs' claims and Defendants' arguments would have benefitted from more focus, precision, and support. Where the parties have not seriously or substantively developed their own positions, I have given them quick treatment. Plaintiffs' claims meet mixed results.

## II. ANALYSIS

The standard governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief is well settled:

> (i) [A]ll well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[24]

---

[23] D.I. 39.

[24] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes omitted) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

8

The touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[25] This standard is "minimal"[26] and plaintiff-friendly.[27] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[28] Despite this forgiving standard, the Court need not accept conclusory allegations unsupported by specific facts or draw unreasonable inferences in favor of the nonmoving party.[29] "Moreover, the court 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'"[30]

### A. Fraudulent Inducement

I begin with what I see as the crux of the Amended Complaint: that Pasko and Wander made a series of misrepresentations during negotiations to induce Plaintiffs to enter into the SPA and Operating Agreement. This theory is presented

---

[25] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[26] *Id.* at 536.

[27] *E.g.*, *Clouser v. Doherty*, 175 A.3d 86, 2017 WL 3947404, at *9 (Del. 2017) (TABLE); *In re USG Corp. S'holder Litig.*, 2021 WL 930620, at *3–4 (Del. Ch. Mar. 11, 2021), *aff'd sub nom. Anderson v. Leer*, 265 A.3d 995 (Del. 2021); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *8 (Del. Ch. July 24, 2009).

[28] *Cent. Mortg.*, 27 A.3d at 536.

[29] *E.g.*, *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

[30] *Trados*, 2009 WL 2225958, at *4 (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

in Count IV's claim for fraudulent inducement against the 777 Partners Defendants. Plaintiffs fail to plead fraud with particularity, as they must.

The elements of fraudulent inducement are: "(i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages."[31]   Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," but "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally."[32]  To satisfy Rule 9(b), a complaint must typically allege:  "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by

---

[31] *LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2018 WL 1559936, at *11 (Del. Ch. Mar. 28, 2018) (internal quotation marks omitted) (quoting *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015)); *Smith v. Mattia*, 2010 WL 412030, at *5 n.37 (Del. Ch. Feb. 1, 2010) ("The elements of fraudulent inducement are the same for those of common law fraud . . . .").

[32] Del. Ch. Ct. R. 9(b).

making the representations."[33]  "The core test is whether the claim has been pled 'with detail sufficient to apprise the defendant of the basis for the claim.'"[34]

Paragraph 50 of the Amended Complaint alleges that during the approximately ten months of negotiations, certain Defendants assured Plaintiffs that "777 Partners would own and operate all aviation and travel-related businesses in which it was engaged . . . and all aviation and travel-related business in which it would later engage, directly through Phoenicia or through a subsidiary of Phoenicia."[35]  Paragraph 51 alleges that "[t]hese representations were each made to O'Neil-Dunne by [Pasko, Wander, and Weiss] and others at 777 Partners in or around the time period from November 2017 up until the close in September 2018."[36]  Paragraph 52 lists twelve meetings O'Neil-Dunne attended during that period. Paragraph 53 quotes a portion of an email Wander sent to O'Neil-Dunne on June 17,

---

[33] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006); *accord Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 142 (Del. Ch. 2009) (quoting *Trenwick Am. Litig. Trust v. Ernst & Young LLP*, 906 A.2d 168, 207–08 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007)).  Failure to plead these details, colloquially referred to as "newspaper facts," is not always fatal under circumstances not present here.  *See, e.g.*, *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *16 (Del. Ch. June 11, 2020) ("While the failure to plead these so-called 'newspaper facts' can be excused in circumstances where the plaintiff would have no way to know that level of detail in advance of bringing the claim, it is reasonable to expect a counter-party in contractual negotiations to be able to back a fraud claim related to the contract with detailed factual allegations."  (footnote omitted)).

[34] *Airborne Health*, 984 A.2d at 142 (quoting *Abry P'rs*, 891 A.2d at 1050).

[35] Am. Compl. ¶ 50.c.

[36] *Id.* ¶ 51.

11

2018, which conveyed "that [the acquiring 777 Partners entity] and O'Neil-Dunne were 'a critical piece of anything 777 will do in the aviation space.'"[37]

These allegations are insufficient under Rule 9(b). First, the June 18 email does not alone support the fraud claim, as it is not clear what being a "critical piece" of anything 777 Partners is doing in the aviation industry means. Even with a plaintiff-friendly eye, I do not read it to promise Plaintiffs will be involved in, or profit from, everything 777 Partners does or will ever do in that space.

The rest of the allegations relate only that meetings took place over a period of about ten months and that some combination of Pasko, Wander, and Weiss attended each of those meetings. The Amended Complaint does not identify which of these Defendants attended nine of those meetings.[38] And it is devoid of a single allegation as to what was said at any meeting and by whom. This fails under the applicable standard, as "[a] plaintiff cannot lump together defendants but must 'identify specific acts of individual defendants' and 'who made any particular misrepresentation.'"[39]

---

[37] *Id.* ¶ 53.

[38] *Id.* ¶¶ 52.a, e–l.

[39] *Trusa v. Nepo*, 2017 WL 1379594, at *9 (Del. Ch. Apr. 13, 2017) (quoting *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *8 (Del. Ch. Jan. 30, 2015)).

Notably, Plaintiffs do not plead when any allegedly fraudulent statement was made, beyond generally alleging that such statements were made during the negotiations. That is likewise insufficient.[40] "Without this level of detail, which a plaintiff who actually was defrauded should be able to provide, Rule 9(b) requires dismissal."[41] Plaintiffs pled only that they came away from about ten months of negotiations with the general impression that Phoenicia would be involved in all of

---

[40] *See MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *9 (Del. Ch. May 10, 2018) (reasoning Rule 9(b)'s requirements were not met where the plaintiff failed to specify when during a six-year period a defendant omitted material information and made allegedly false statements); *id.* at *9 n.120 ("Federal courts applying the analogous Federal Rule of Civil Procedure 9(b) have held that alleging a time frame of six or more months is insufficient to satisfy the particularity requirement." (citing *Hatteras Enters. Inc. v. Forsythe Cosmetic Grp., Ltd.*, 2018 WL 1935984, at *11 (E.D.N.Y. Apr. 23, 2018); and *McCann v. Jupina*, 2017 WL 1540719, at *2 (N.D. Cal. Apr. 28, 2017)); *Trusa*, 2017 WL 1379594, at *9 (concluding the plaintiff failed to satisfy Rule 9(b) where he pled the allegedly fraudulent statements "occurred 'before the Loan Agreement was signed'" (citation omitted)); *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *7 (Del. Ch. Jan. 30, 2015) (reasoning that alleging misrepresentations were made "some time during a period of approximately 3–1/2 months from when the parties began their negotiations (March 12, 2013) until the Merger Agreement was signed (July 1, 2013)" was "the functional equivalent to providing no time parameter at all because the misrepresentations logically could not have occurred during any other period of time"); *see also Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *11 n.114 (Del. Ch. June 6, 2018) ("Buyers allege that Sellers made the fraudulent statements 'continually' and 'throughout' the nine months the parties negotiated the Transaction. That lack of precision with respect to timing arguably falls short of the particularity requirement as set forth in Rule 9(b)." (citation omitted)); *McCann v. Jupina*, 2017 WL 1540719, at *2 (N.D. Cal. Apr. 28, 2017) ("[C]ourts have held that a nine-month window is not sufficiently narrow to satisfy Rule 9(b)." (citing *In re NJOY, Inc. Consumer Class Action Litig.*, 2015 WL 12732461, at *13 (C.D. Cal. May 27, 2015); and *Franco v. U.S. Bank N.A.*, 2014 WL 6090647, at *3 (W.D. Tex. Nov. 13, 2014); and *Hirata Corp. v. J.B. Oxford & Co.*, 193 F.R.D. 589, 598 (S.D. Ind. 2000)).

[41] *Airborne Health*, 984 A.2d at 143.

13

777 Partners's aviation-related business ventures. This is not enough to state a claim for fraud, and Count IV is dismissed.[42]

## B. Breach Of The Operating Agreement

In Count I, Plaintiffs allege that operating the Jet Leasing Business outside of Phoenicia and executing self-interested agreements with alleged Phoenicia subsidiaries breached the Operating Agreement's express or implied terms. Defendants' motion to dismiss is granted as to the claim for breach of an express requirement to operate the Jet Leasing Business through Phoenicia. The motion to dismiss is denied as to the rest of the claims asserted in Count I.

### 1. Breach Of The Company Purpose Clause

Count I asserts that by "failing to cause Phoenicia to operate the 777 Jet Leasing Business through Phoenicia and/or a subsidiary of Phoenicia," 777 Partners breached the Operating Agreement's company purpose clause.[43] Plaintiffs interpret this provision as "memorializ[ing] Defendants' representations that 777 Partners's aviation business would be carried out through Phoenicia," calling it "essentially a representation or warranty, committing the company to carry out the stated

---

[42] The Amended Complaint also alleges that the same representation was included in the Operating Agreement. Am. Compl. ¶ 164. As explained in Section II.B.1, *infra*, the Operating Agreement includes no such representation.

[43] Am. Compl. ¶ 129. Count I is also nominally against Phoenicia itself, though it appears that the claim for breach of the Company's purpose clause is being pursued against only 777 Partners. The parties briefed this issue consistently with this claim being asserted against only 777 Partners.

purpose."[44] 777 Partners argues that the purpose clause permits Phoenicia to carry out the referenced purposes and empowers it to do so, but imposes no obligations, and is not a representation or warranty, such that members could breach by engaging in activity outside Phoenicia. I agree with 777 Partners.

Delaware follows the objective theory of contracts, meaning "a contract's construction should be that which would be understood by an objective, reasonable third party."[45] Delaware courts interpret contracts with the goal of effectuating the parties' intent.[46] "When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions."[47] The Court "will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."[48]

Section 3.1 includes the company purpose clause, as well as other language. Broken out by sentence number for clarity, Section 3.1 reads in full:

---

[44] PAB 23.

[45] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[46] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[47] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (internal quotation marks omitted) (quoting *Osborn*, 991 A.2d at 1159–60).

[48] *See Osborn*, 991 A.2d at 1159 (internal quotation marks omitted) (quoting *Kuhn*, 2010 WL 779992, at *2).

Company Purposes.

[1] The purpose of the Company is to (i) engage in the business of acquiring and operating airlines and other related industries, providing services and creating, selling and licensing software for use in the airline and travel industries, and such other activities incident, necessary, advisable or desirable to carry out the foregoing (the "**Company Business**"), and (ii) engage in any other lawful act or activity for which a limited liability company may be organized under the laws of the State of Delaware as determined by the Board from time to time.

[2] The Company shall have all powers available to limited liability companies under the Act to make and perform all contracts and to engage in all actions and transactions necessary or advisable to carry out the purposes of the Company.

[3] Subject to any additional restrictions set forth in the . . . Employment Agreement, [MALT] shall conduct the Company Business through the Company, and, for the avoidance of doubt, [MALT], either directly or through any other company, may not conduct any business activities substantially similar to the Company Business or the business of any Subsidiary or Affiliate (in each case, including any reasonable extensions thereof), or to any future line of business which the Company or any Subsidiary or Affiliate enters into while [MALT] holds an interest in or is employed by the Company (or, if [MALT] is an entity, while the person who owns the Membership Interests is employed by the Company), regardless of whether such Company Business is conducted by the Company or any Subsidiary directly or through one or more of its respective Affiliates.[49]

I refer to the first sentence as the "Purpose Clause."

I begin with this clause's text. The Purpose Clause's plain language does not reflect that 777 Partners is promising to limit its business activities outside of

---

[49] Op. Agr. § 3.1 (formatting altered).

Phoenicia. No language suggests that 777 Partners is representing or warranting the same. Elsewhere in the Operating Agreement, 777 Partners and MALT made representations and warranties prefaced by the language "[e]ach Member hereby represents and warrants to the others that . . . ."[50] This language is absent from Section 3.1.

Other language in Section 3.1 demonstrates that the parties did not intend for the Purpose Clause to limit 777 Partners's business activities outside of Phoenicia. Section 3.1's third sentence prohibits MALT and its affiliates from engaging in Company Business outside the Company while, among other things, it holds Phoenicia equity. It does not similarly restrict 777 Partners. Under the interpretative maxim of *expressio unius est exclusio alteris*, the inclusion of only MALT and its affiliates indicates the intentional exclusion of 777 Partners from this prohibition.[51]

Additionally, Plaintiffs' reading of the first sentence would render the third sentence superfluous. MALT and 777 Partners are both parties to the Operating

---

[50] Op. Agr. §§ 14.17, 14.18.

[51] *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *3 (Del. Ch. Nov. 8, 2007) ("By saying only Seidensticker, the drafters excluded the other individuals contemplated by section V, because *expressio unius est exclusio alterius*."); 5 *Corbin on Contracts* § 24.28 (2023) ("If the parties in their contract have specifically named one item or if they have specifically enumerated several items of a larger class, a reasonable inference is that they did not intend to include other, similar items not listed."); *see also e.g.*, *Active Asset Recovery, Inc. v. Real Est. Asset Recovery Servs., Inc.*, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) (applying the maxim and reasoning that the inclusion of one term but not another "speaks volumes").

Agreement. Assuming arguendo that the Purpose Clause restricted 777 Partners from conducting Company Business outside Phoenicia, that limitation would apply equally to MALT. But Section 3.1's third sentence expressly restricts MALT from conducting Company Business outside Phoenicia. Plaintiffs' reading would render that sentence superfluous, and is therefore disfavored.[52]

Having ruled out what the Purpose Clause does not do, I turn to what it does. By its plain language, the first sentence of Section 3.1 is an express purpose clause. Delaware's LLC Act does not require an LLC operating agreement to include a purpose clause, and by default permits companies to "carry on any lawful business, purpose or activity."[53] Against this backdrop, LLC purpose clauses "generally may be viewed more as helpful clarification than as a necessity and . . . may function more as limiting than enabling provisions."[54] They deprive the entity of authority to

---

[52] *See Seidensticker*, 2007 WL 4054473, at *3 ("When interpreting contracts, this Court gives meaning to every word in the agreement and avoids interpretations that would result in 'superfluous verbiage.'" (quoting *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008)); *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008).

[53] 6 *Del. C.* § 18-106(a).

[54] Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 2.07, at 2-22 (2nd ed. 2019).

validly engage in activities beyond those limits.[55]  A limited purpose clause restricts the company, not its members.[56]  A purpose clause does not itself restrain the company from competing with its own members.[57]

Nevertheless, a party to an operating agreement may breach a limited purpose clause by causing the company to exceed its authority.[58]  In determining whether such a breach occurred, the "threshold question" is "whether *the Company* has acted in accordance with" the limited purpose clause.[59]  Only after a plaintiff makes a showing that the company failed to act in accordance with its purpose will the Court inquire whether another party breached the operating agreement by causing it to do so.[60]

---

[55] *Symbiont.io, Inc. v. Ipre Hldgs., LLC*, 2021 WL 3575709, at *43 (Del. Ch. Aug. 31, 2021); *In re Arrow Inv. Advisors, LLC*, 2009 WL 1101682, at *4 (Del. Ch. Apr. 23, 2009) ("[A]n important reason for parties to include a broad purpose clause in an entity's governing instrument is to ensure that the entity has flexibility to adapt in the face of changing circumstances.").

[56] *See Symbiont.io*, 2021 WL 3575709, at *43–44.

[57] *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Service of Cincinnati*, 1996 WL 506906, at *7 (Del. Ch. Sept. 3, 1996).  A purpose clause can expand or narrow the universe of corporate opportunities that, if taken from the company by a member, would undergird a breach of fiduciary duty action.  *See* LLCs, P'ships & Unincorporated Entities Comm., ABA Bus. L. Section, *Single-Member LLC Entity Member Form*, 69 Bus. Law. 745, 773 n.9 (2014) ("Use of a narrow purpose clause also can affect the application of the business opportunity doctrine and limit the circumstances where the member or the manager would be deemed to be taking an opportunity.").

[58] *See Symbiont.io*, 2021 WL 3575709, at *43–44.

[59] *Id.* at *44.

[60] *See id.*

Here, the Purpose Clause enumerates and limits what Phoenicia can do, setting the contours of the Company's business as follows: "the business of acquiring and operating airlines and other related industries, providing services and creating, selling and licensing software for use in the airline and travel industries, and such other activities incident, necessary, advisable or desirable to carry out the foregoing."[61] In doing so, the clause confines the Company's zone of authorized action to aviation and travel sectors, unless the Company's Board of Managers (the "Board") determines otherwise.[62] The Purpose Clause can be breached if Phoenicia acts outside of its enumerated business lines—but that is not what Plaintiffs allege. They allege Phoenicia's members conducted business through other entities, rather than through Phoenicia. That conduct is not a breach of Phoenicia's Purpose Clause under any theory presented to the Court.

I conclude the Purpose Clause does not require 777 Partners to operate the Jet Leasing Business through Phoenicia.[63] Count I fails to state a claim for breach of the Purpose Clause.

---

[61] Op. Agr. § 3.1(i).

[62] *Id.* § 3.1(ii) (allowing the Company to engage in "in any other lawful act or activity . . . as determined by the Board from time to time").

[63] Count I also includes a claim that 777 Partners and Phoenicia breached the Operating Agreement "by failing to pursue diligently and to execute the Phoenicia Purpose." Am. Compl. ¶ 130. Defendants briefed this issue in their opening brief, but Plaintiffs did not address it in their answering brief. DOB 18–19. I find that it has been abandoned. *See*

20

## 2. Breach Of The Operating Agreement For Entering Into Interested Leases

Count I also alleges 777 Partners breached the Operating Agreement by causing Phoenicia subsidiaries to enter into interested contracts that did not comport with the Operating Agreement's requirements for such contracts set forth in Section 5.4.[64]  Section 5.4, titled "Transactions Between the Company and the Members," prohibits the Company and its subsidiaries from entering into certain interested transactions unless a cleansing process is followed.[65]  In moving to dismiss Count I, 777 Partners did not take on Section 5.4; it overlooked the Amended Complaint's allegations concerning Section 5.4 and its obligations, and argued the Amended

---

*Capano v. Capano*, 2014 WL 2964071, at *16 (Del. Ch. June 30, 2014).  Regardless, it fails for this same reason.

[64] Am. Compl. ¶¶ 87–90, 131–32; Op. Agr. § 5.4 ("The Company or any Subsidiary shall not enter into an Interested Transaction (as defined below) unless it has first fully disclosed the terms and conditions of such Interested Transaction to the Board and the Board determines that the Interested Transaction is fair and reasonable to the Company or such Subsidiary, and the terms and conditions are at least as favorable to the Company or such Subsidiary as those that are generally available from persons capable of similarly performing them and in similar transactions between parties operating at arm's length.").

Like the claim for breach of the Purpose Clause, this count is nominally asserted against 777 Partners and Phoenicia, but Plaintiffs briefed the claim as if asserted against only 777 Partners.  PAB 26 ("[The Amended Complaint] further alleges that 777 Partners caused Phoenicia subsidiaries to enter into leases with these affiliates, which were consequently "interested transactions" under the Phoenicia Agreement.").  Like Plaintiffs' brief, I treat the claim as asserted against only 777 Partners.

[65] Op. Agr. § 5.4.

21

Complaint did not identify any specific contractual provision that was breached.[66]

777 Partners's contentions that it has not breached Section 5.4 will have to wait for trial.[67]

### 3. Breach Of The Implied Covenant Of Good Faith And Fair Dealing

Plaintiffs allege, nearly in passing, that certain Defendants breached the Operating Agreement's and SPA's implied terms by pursuing the Jet Leasing Business outside of Phoenicia.[68] Defendants argue that the implied covenant claims

---

[66] DOB 17–18 ("Because Plaintiffs fail to identify any specific contractual obligation breached by defendants, their claim should be dismissed."). Plaintiffs pointed out they alleged a breach of Section 5.4 in their answering brief, and Defendants argued Plaintiffs failed to state a claim thereunder in their reply brief. PAB 25–27; DRB 17–18; *see also* Am. Compl. ¶ 89 ("The 777 Leases were not objectively 'fair and reasonable' under the circumstances for the [aviation] lessees as required by Section 5.4 of the Phoenicia Agreement.").

[67] *Mack v. Rev Worldwide, Inc.*, 2020 WL 7774604, at *16 (Del. Ch. Dec. 30, 2020); *Keen-Wik Ass'n v. Campisi*, 2020 WL 6162957, at *6 n.53 (Del. Ch. Oct. 19, 2020) ("Generally, arguments are waived if presented for the first time in a reply brief."). The scheduling order in this case should require that any party seeking to move for summary judgment first seek leave from the Court for doing so.

[68] The Amended Complaint mentions the implied covenant only three times. Am. Compl. ¶¶ 21, 133–34. Paragraph 21 alleges that "Defendants' diversion of aviation opportunities from Phoenicia was . . . a material breach of Defendants' implied covenants of good faith and fair dealing in [the Operating Agreement and SPA]." *Id.* ¶ 21. Paragraphs 133 and 134 allege only that 777 Partners and Phoenicia each "breached [their] covenants of good faith and fair dealing" in the Operating Agreement, and that 777 Partners breached the SPA's implied covenant. *Id.* ¶¶ 133–34. I read the Amended Complaint as pleading a breach of the implied covenant only for operating the Jet Leasing Business outside Phoenicia. This is consistent with how the parties briefed the issue. DOB 24–28; PAB 27–29; DRB 18–20.

should be dismissed because they are duplicative of the express breach of contract claims.[69]

The implied covenant of good faith and fair dealing "attaches to every contract."[70] But where express terms govern the conduct at issue, the Court will decline to imply contrary terms.[71] As explained by Vice Chancellor Laster in *Garfield v. Allen*, seeking dismissal of duplicative claims is "a throwback to common law pleading."[72] Plaintiffs are entitled to plead in the alternative under Court of Chancery Rule 8,[73] and litigants do not have a right to dismissal on the basis that claims are duplicative.[74] Nevertheless, dismissal of duplicative claims "can help

---

[69] Defendants also broadly argue that the scope of the term Plaintiffs seek to have implied is itself so broad that "one would think that Plaintiffs would have insisted that it be explicitly set forth in the Share Purchase agreement." DOB 26. Defendants did not attempt to support this argument with any law. I do not consider it.

[70] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005).

[71] *All. Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.*, 963 A.2d 746, 770 (Del. Ch.), *aff'd*, 976 A.2d 170 (Del. 2009).

[72] *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 360 (Del. Ch. 2022).

[73] Ct. Ch. R. 8(e)(2) ("A party may set forth 2 or more statements of a claim or defense alternately or hypothetically, either in 1 count or defense or in separate counts or defenses. . . . A party may also state as many separate claims or defenses as the party has regardless of consistency."); *Goldstein v. Denner*, 2022 WL 1797224, at *3 (Del. Ch. June 2, 2022) ("Court of Chancery Rule 8 permits a plaintiff to plead theories in the alternative. It therefore does not matter at the pleading stage whether the *Brophy* claim might be duplicative of the Sale Process Claims."); *Garfield*, 277 A.3d at 362 ("[T]he plaintiff is entitled to plead in the alternative under Rule 8 . . . .").

[74] *See Garfield*, 277 A.3d at 361 (quoting *Spencer v. Malik*, 2021 WL 719862, at *5 (Del. Ch. Feb. 23, 2021) (ORDER); *cf. Swipe Acq. Corp. v. Krauss*, 2020 WL 5015863, at *8 (Del. Ch. Aug. 25, 2020) ("Whether to dismiss a claim as duplicative is within the discretion of the Court.").

formulate and simplify the issues for trial."[75] Relevant here, at the motion to dismiss stage, our courts have dismissed claims for breach of the implied covenant where they are duplicative of claims for breach of express terms that survive a motion to dismiss or that the defendants did not move to dismiss.[76]

Here, as explained, I dismissed Plaintiffs' claim that operating the Jet Leasing Business outside Phoenicia breached the Purpose Clause. And Defendants have not identified any contractual language specifically addressing the issue in dispute. Plaintiffs' broad pleadings, and Defendants' conclusory arguments, give me no foothold from which to dismiss the implied covenant claims on the grounds that they are duplicative.

\* \* \*

Count I is dismissed as to breach of the Operating Agreement's Purpose Clause, but not as to the claims for breach of Section 5.4 and the implied covenant.

## C. Breach Of The SPA Claims

Count II alleges that 777 Partners breached the SPA "by breaching the Phoenicia Agreement."[77] 777 Partners moved to dismiss this count, asserting that

---

[75] *Garfield*, 277 A.3d at 361.

[76] *See, e.g.*, *Edinburgh Hldgs*, 2018 WL 2727542, at \*9 (dismissing implied covenant claim as duplicative where the plaintiff brought claims for breach of the same contractual rights that the defendants did not move to dismiss, and where the relevant agreement expressly addressed the rights at issue).

[77] Am. Compl. ¶ 142.

Plaintiffs did not identify any SPA provisions that were breached. In responsive briefing, Plaintiffs cited warranties in the SPA binding 777 Partners.[78]

"At the pleading stage of a written contract dispute, Rule 8 requires the plaintiff to take the basic and customary step of producing the agreement and citing to the provisions alleged to have been breached."[79] And the "[f]ailure to do so 'is not a technical foot fault; it reflects, instead, a fundamental failure to give the [defendant] fair notice of the claim asserted against [him] as required by [] Rule 8.'"[80] The Amended Complaint did not identify any provisions of the SPA that were breached, and "[a]rguments in briefs do not serve to amend the pleadings."[81] Plaintiffs' claims for breaches of express provisions of the SPA are dismissed. Similarly, the Amended Complaint does put 777 Partners on notice of what implied SPA provisions Plaintiffs alleges were breached. Plaintiffs' claim for breach of the SPA's implied covenant of good faith and fair dealing is dismissed.

---

[78] PAB 31–32 (citing SPA § 6.5(ii)).

[79] *Enzolytics, Inc. v. Empire Stock Transfer Inc.*, 2023 WL 2543952, at *3 (Del. Ch. Mar. 16, 2023).

[80] *Id.* (alterations in original) (quoting *Ryan v. Buckeye P'rs, L.P.*, 2022 WL 389827, at *6 (Del. Ch. Feb. 9, 2022), *aff'd*, 285 A.3d 459 (Del. 2022)).

[81] *Cal. Pub. Emps. Ret. Sys. v. Coulter*, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002).

25

## D. Breach Of Fiduciary Duty Claims

Count VI asserts a derivative breach of fiduciary duty claim against the 777 Partners Defendants.[82] It alleges these Defendants breached their fiduciary duties by (1) conducting the Jet Leasing Business outside Phoenicia, thus usurping a company business opportunity; (2) causing "Phoenicia to acquire and participate in marginally profitable and unprofitable airline businesses through Interested Transactions and related party transactions"; and (3) grossly mismanaging Phoenicia. The motion is denied as to the usurpation claim and the claim that the 777 Partners Defendants caused Phoenicia to enter into unfair, interested transactions. These Defendants did not move to dismiss as to the claim that they grossly mismanaged Phoenicia, so that claim survives as well.[83]

### 1. Usurpation Of A Business Opportunity

Court VI asserts a breach of fiduciary duty claim against the 777 Partners Defendants for operating the Jet Leasing Business outside of Phoenicia, which the

---

[82] Defendants have not moved to dismiss under Court of Chancery Rule 23.1 and do not contest that demand is futile.

[83] This claim was not mentioned or addressed in Defendants' opening brief or reply brief. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

Count VI alleges that "Pasko, Wander, and 777 Partners further breached their fiduciary duties by baselessly failing to provide MALT with the 8% membership interest to which it was entitled, and by reducing the membership interest of MALT from 5% to 3% without basis and in bad faith." Am. Compl. ¶ 190. Defendants did not brief this claim, so it is not dismissed.

26

parties brief as a claim for usurpation of a business opportunity.[84] The 777 Partners Defendants argue the Operating Agreement eschews the corporate opportunity doctrine. They misread the Operating Agreement and Delaware law.

By default, managers of manager-managed LLCs owe fiduciary duties, including the duty of loyalty.[85] Similarly, controllers of an LLC owe fiduciary duties.[86] Such duties may be waived in an operating agreement only through "plain and unambiguous" language.[87] The corporate opportunity doctrine sounds in the duty of loyalty,[88] and may be waived or limited in the same manner.[89]

---

[84] Our caselaw in this area refers to the doctrine as the "corporate opportunity doctrine" notwithstanding its application to LLCs. *See, e.g.*, *Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *25 (Del. Ch. Feb. 24, 2020); *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *18 (Del. Ch. Jan. 31, 2017). I do the same.

[85] *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 851 (Del. Ch.), *aff'd*, 59 A.3d 1206 (Del. 2012); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) ("[T]he Delaware Limited Liability Company Act . . . contemplates that equitable fiduciary duties will apply by default to a manager or managing member of a Delaware LLC.").

[86] *See Glidepath Ltd. v. Beumer Corp.*, 2019 WL 855660, at *18 (Del. Ch. Feb. 21, 2019).

[87] *Ross Hldg. & Mgmt. Co. v. Advance Realty Grp., LLC*, 2014 WL 4374261, at *13 (Del. Ch. Sept. 4, 2014) (internal quotation marks omitted) (quoting *Feeley*, 62 A.3d at 664).

[88] *See Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 963–64 (Del. 1980) ("[T]he law of corporate opportunity sets the parameters of permissible employee conduct consistent with an employee's fiduciary duties to his employers of loyalty and fair dealing.").

[89] *See, e.g.*, *Skye*, 2020 WL 881544, at *25.

The 777 Partners Defendants argue the usurpation claim is foreclosed by Section 4.8 of the Operating Agreement, which they contend "expressly disclaims the corporate opportunity doctrine."[90] Numbered for clarity, that section reads:

> [1] No Manager shall be required to manage the Company as his or her sole and exclusive function, and may have other business interests and, except as otherwise expressly set forth herein or in any employment agreement between a Manager and the Company or an Affiliate thereof, if applicable, may engage in other activities in addition to those relating to the Company.

> [2] Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Managers or their Affiliates or to the income or proceeds derived therefrom.

> [3] Notwithstanding the foregoing, nothing in this Section 4.8 or any other provision herein, shall limit, waive or otherwise amend the Managers' fiduciary duty of care and loyalty to the Company and its Members pursuant to Section 18-1104 of the Act with respect to such other business interests and activities; and the Managers shall refrain from engaging in any activity which is inconsistent with their obligations thereunder.[91]

The 777 Partners Defendants point to Section 4.8's first sentence and contend this Court concluded similar language rejected the corporate opportunity doctrine in *Skye Mineral Investors*.[92]

In *Skye*, the Court interpreted an operating agreement provision reading: "[i]n view of the limited purposes of the Company, no Member nor any of its Affiliates

---

[90] DOB 30.

[91] Op. Agr. § 4.8 (formatting altered).

[92] 2020 WL 881544 (Del. Ch. Feb. 24, 2020).

28

shall have any fiduciary obligations with respect to the Company or to the other Members insofar as making other investment opportunities available to the Company or to the other Members."[93]   The Court concluded that language "unambiguously 'eschews the corporate opportunity doctrine.'"[94]   *Skye* relied on *CelestialRX Investments'* interpretation of "similar language."[95] The provision in *CelestialRX* read:

> Nothing in this Agreement shall be construed to prohibit any Director or any Member from engaging in or possessing an interest in another business venture of any nature, even if competitive with the Company; and neither the Company nor any other Member shall have any rights by virtue of this Agreement in or to any such venture or the income or profits derived therefrom.  No Person solely by virtue of his or its status as a Director or Member of the Company, shall be prohibited from engaging in or possessing an interest in another business venture of any nature, even if competitive with the Company.  Neither any Director nor any Member shall be obligated, by the provisions hereof or by their status as a Director or Member, to present any particular investment or business opportunity to the Company even if such opportunity is of a nature which could be taken by the Company.[96]

*CelestialRX* held this language "eschews the corporate opportunity doctrine, and permits conflicted interests to be held by Directors and Members, unless provided otherwise by separate contract."[97]

---

[93] *Id.* at *3 (internal quotation marks omitted) (emphasis added) (citation omitted).

[94] *Id.* at *25 (quoting *CelestialRX*, 2017 WL 416990, at *18).

[95] *Id.* at *25 n.311.

[96] *CelestialRX*, 2017 WL 416990, at *17.

[97] *Id.* at *18.

The provisions in both *Skye* and *CelestialRX* differ from Section 4.8. Those provisions expressly stated that the member or manager had no "fiduciary obligations with respect to the Company or to the other Members" concerning opportunities,[98] or that members shall not "be obligated . . . to present" the opportunities to the company or the other members: Section 4.8 does not.[99] Indeed, Section 4.8's last sentence makes plain that the Managers still owe fiduciary duties: "Notwithstanding the foregoing, nothing in this Section 4.8 or any other provision herein, shall limit, waive or otherwise amend the Managers' fiduciary duty of care and loyalty to the Company and its Members pursuant to Section 18-1104 of the Act with respect to such other business interests and activities . . . ."[100] "A dependent phrase that begins with *notwithstanding* indicates that the main clause that it introduces or follows derogates from the provision to which it refers."[101] Section 4.8's first sentence, which the 777 Partners Defendants rely on, is subservient to its third. That third sentence makes clear that the parties did not intend to waive

---

[98] *Skye*, 2020 WL 881544, at *25 (internal quotation marks omitted) (citation omitted).

[99] *CelestialRX*, 2017 WL 416990, at *17.

[100] Op. Agr. § 4.8.

[101] Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 126–27 (2012); Kenneth A. Adams, *A Manual of Style for Contract Drafting* § 13.631 (5th ed. 2023); *see also JER Hudson GP XXI LLC v. DLE Invs., LP*, 275 A.3d 755, 804–08 (Del. Ch. 2022) (applying Virginia law and interpreting the phrase "notwithstanding anything to the contrary").

30

fiduciary duties relating to usurpation of "other business interests and activities."[102] Section 4.8 does not preclude the usurpation claim.

### 2. Interested Transactions With Phoenicia Subsidiaries

Count VI also includes a claim for breach of fiduciary duty on the basis that the 777 Partners Defendants "caused Phoenicia to acquire and participate in marginally profitable and unprofitable airline businesses through" unfair and self-dealing transactions.[103] Only 777 Partners moved to dismiss this claim, and it did so solely on the basis that it is duplicative of the breach of contract claim for that same conduct.[104] Defendants have also argued in the alternative that the other breach of fiduciary duty claims are duplicative of the breach of contract claims.

As stated earlier, there is no right to dismissal of such claims on the grounds they are duplicative, but doing so "can help formulate and simplify the issues for trial."[105] If 777 Partners is correct that this fiduciary duty claim is truly duplicative of the contract claims, "[a]ll of the claims arise from a common nucleus of operative

---

[102] Defendants' argument falls short in other ways. For example, Section 4.8 applies only to Company managers, and 777 Partners is not a manager.

[103] Am. Compl. ¶ 185.

[104] DOB 31 (titling section "Plaintiffs' Breach Of Fiduciary Duty Claims Against 777 Partners Should Be Dismissed Because It Is Duplicative Of Plaintiffs' Breach Of Contract Claims."); *id.* at 32 ("Plaintiffs' breach of fiduciary duty claim against 777 Partners arises from the same set of alleged facts as its breach of contract claims."); *id.* at 33 ("Therefore, Plaintiffs' fiduciary duty claim against 777 Partners must be dismissed.").

[105] *See Garfield*, 277 A.3d at 361.

fact, so a pleading-stage ruling is unlikely to simplify discovery or the presentation of the evidence at trial."[106] At this stage, "the game is not worth the candle."[107] The parties did not fairly join issue on whether the self-interested transactions breached Section 5.4. I decline to dismiss the breach of fiduciary duty claims on the grounds that they are duplicative.[108]

### E. Unjust Enrichment

Count V asserts a claim for unjust enrichment against Pasko, Wander, and Weiss. The allegedly wrongful conduct underlying the unjust enrichment claim is identical to that underlying the breach of fiduciary duty claim. Pasko and Wander moved to dismiss the unjust enrichment claim on the basis that "Plaintiffs failed to plead facts demonstrating a breach of fiduciary duty by either Pasko or Wander, their unjust enrichment claim must be dismissed."[109] But these Defendants moved to dismiss the relevant breach of fiduciary duty claim solely on the basis that Section 4.8 eschews the corporate opportunity doctrine—not on whether any underlying wrongdoing was pled. Regardless, all of the breach of fiduciary duty claims survive this motion, including the usurpation claim. Pasko and Wander have not presented

---

[106] *Id.* at 361–62.

[107] *Id.* at 362.

[108] 777 Partners also moved to dismiss the claim for breach of fiduciary duty for operating the Jet Leasing Business outside Phoenicia on the grounds that it is duplicative of the breach of contract claims. I likewise decline to dismiss that claim as duplicative.

[109] DOB 35 (internal citation omitted).

32

any cogent or compelling argument on which to dismiss the unjust enrichment claim against them.

Weiss moved to dismiss the unjust enrichment claim as duplicative of the aiding and abetting claim against him and on the basis that the Amended Complaint did not plead he participated in any breach. As with the breach of fiduciary duty claims, I decline to dismiss the unjust enrichment claim on the basis that it is duplicative.[110] But, as explained below in the context of the aiding and abetting claim against Weiss, Plaintiffs did not plead that he participated in any wrongdoing in this action.[111] Count V is dismissed as against Weiss.

### F. Aiding And Abetting

Count VII asserts a derivative claim against Weiss for aiding and abetting "in the breaches of fiduciary duties committed by Pasko, Wander and 777 Partners."[112] An aiding and abetting claim has four elements: "(1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a

---

[110] *See Garfield*, 277 A.3d at 360–62 (declining to dismiss an unjust enrichment claim as duplicative of a breach of contract claim).

[111] *In re Lear Corp. S'holder Litig*., 967 A.2d 640, 657 (Del. Ch. 2008) (dismissing unjust enrichment claim where the complaint failed "to support an inference that [the defendant] was engaged in some form of wrongdoing," just as it had failed to support knowing participation in a breach).

[112] Am. Compl. ¶ 206.

fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary."[113]

"The most critical element for an aiding-and-abetting claim is the defendant's knowing participation in the breach."[114] Knowing participation "has two dimensions: knowledge and culpable participation."[115] Aiding and abetting liability "requires that 'the accessory actor's conduct be informed by knowledge of the primary duty or its breach and that [the accessory actor] make a causally significant contribution to the wrong suffered by the party to whom the primary actor owes a duty.'"[116]

---

[113] *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *15 (Del. Ch. Nov. 30, 2007).

[114] *In re Columbia Pipeline Grp., Merger Litig.*, 299 A.3d 393, 470 (Del. Ch. 2023).

[115] *Id.*

[116] *Id.* at 471 (alteration in original) (quoting Deborah A. DeMott, *Culpable Participation in Fiduciary Breach, in Research Handbook on Fiduciary Law* 219 (D. Gordon Smith & Andrew S. Gold, eds. 2018); *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *42 (Del. Ch. Aug. 27, 2015) (finding an advisor did not aid and abet a breach of fiduciary duty where the advisor "was not directly involved, nor even secondarily involved, in the critical breaches of duty"); *see also In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *28 n.256 (Del. Ch. May 4, 2005) (dismissing claim of aiding and abetting a breach of fiduciary duty in part because the "plaintiffs have failed to adequately plead facts such that this Court could reasonably infer that [the defendant] was actively involved in deciding what information would be disclosed through the Consent Solicitation and how."), *aff'd*, 897 A.2d 162 (Del. 2006); *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986) (dismissing an aiding and abetting claim because "the plaintiff alleges no facts from which it can be reasonably inferred that Anschutz or TAC played any role in the Rio Grande defendants' decision not to disclose the existence of the ICC proceedings or the pro forma financial projections").

Nearly all of the allegations Plaintiffs identify as demonstrating knowing participation are conclusory and fail to show that Weiss contributed to the alleged breaches.[117] Paragraph 9 pleads that Weiss "participated materially in the management of Phoenicia, including by making decisions on behalf of the company," but does not explain how he was involved in any breach.[118] Paragraph 52 alleges only that Weiss was present for three meetings during the approximately ten months of negotiations. Paragraph 91 states only that Weiss participated materially "in the business of 777 Partners and Phoenicia" and in Phoenicia's management.[119] Paragraphs 200 through 204 allege in conclusory fashion that Weiss knew the 777 Partners Defendants intended to wrongfully conduct the Jet Leasing Business outside Phoenicia and "intentionally assisted [the 777 Partners Defendants] in their diversion of business opportunities."[120] These paragraphs do not contain any well-pled allegation that Weiss participated in the alleged breaches. Count VII is dismissed.

---

[117] PAB 39 (citing Am. Compl. ¶¶ 9, 52, 91, 200–04).

[118] Am. Compl. ¶ 9. The same paragraph mentions that Weiss is the CEO of 777 Partners's "Aviation and Travel Group," but the Amended Complaint does not explain what that is or how it relates to Phoenicia or the allegations in the Amended Complaint, if at all.

[119] *Id.* ¶ 91.

[120] *Id.* ¶¶ 200–04.

## G. Corporate Governance Claims

Count X alleges Defendants breached the Operating Agreement by (1) failing to hold Board meetings at least quarterly; (2) failing to submit and approve the annual budget; (3) failing to consult with the Board concerning the corporate actions enumerated in Section 4.3(a); and (4) failing to keep O'Neil-Dunne informed and apprised of the activities of the Company in his capacity as a manager. Section 4.3(a) of the Operating Agreement requires the Board to meet at least quarterly to "consult with, advise and direct the [Company's officers] . . . with respect to" an enumerated list of subjects, "among other things."[121] Section 4.7(b) requires the Company's officers to submit a budget for Board approval within sixty days of the start of each fiscal year, and Section 4.7(c) requires that the Board approve or disapprove the proposed budget within thirty days of receipt.[122]

The 777 Partners Defendants moved to dismiss on the ground that Plaintiffs may obtain specific performance against Phoenicia, but not the other Defendants in their individual capacities. Plaintiffs do not contest this.[123] The only remaining issue is whether Plaintiffs may prevail on this claim against Phoenicia.

---

[121] Op. Agr. § 4.3(a).

[122] *Id.* §§ 4.3(b)–(c).

[123] PAB 42–43 ("Plaintiffs have no objection to dismissal of the specific performance cause of action against 777 Partners (the Series A member) and Pasko and Wander (a majority of the Board) based upon the same premise—that those defendants will be bound by an order.").

Defendants argued that Plaintiffs have not identified any provision of the Operating Agreement that imposes an obligation to keep O'Neil-Dunne informed of the Company's activities. Plaintiffs did not refute this in their answering brief. The claim seeking specific performance on this basis is dismissed.[124]

Defendants do not dispute that Phoenicia was obligated to take the other three enumerated actions and failed to do so. Rather, Defendants contest this claim on the basis that because O'Neil-Dunne is a Phoenicia manager,[125] he has "the power to take (or at least request) the very actions he complains Defendants failed to take."[126] Plaintiffs retort that "[n]othing in the [Operating Agreement] gives [O'Neil-Dunne] the authority to take unilateral action for the company."[127] At this stage, the fact that the parties agree these actions were required and were not taken is sufficient to state a claim for breach. The motion to dismiss is granted in part as to Count X.

---

[124] *Enzolytics*, 2023 WL 2543952, at *3.

[125] The Amended Complaint does not plead that O'Neil-Dunne is a Company manager, but Plaintiffs concede this point in their answering brief. PAB 42 ("But O'Neil-Dunne is only one of three Managers—*i.e.*, a minority.").

[126] DOB 43. The movants do not assert MALT could take these actions, so MALT's claim would stand even if O'Neil-Dunne's fell.

[127] PAB 42.

### H.     MALT's Interest In Phoenicia

Finally, Count III asserts that 777 Partners and Phoenicia breached the SPA by failing to provide MALT with an 8% interest in Phoenicia.  Count IX seeks a declaratory judgment that it holds an 8% interest in Phoenicia.

For purposes of this motion, the parties do not dispute that MALT held at least a 6% interest; the dispute is over whether it should hold 7%.[128]  MALT would have received an additional 1% stake if the third and fourth milestones had been satisfied; Plaintiffs contend those milestones would have been met if Defendants had operated the Jet Leasing Business through Phoenicia.

Defendants seek dismissal of these counts on the grounds that the Amended Complaint does not allege the milestones were actually met.[129]  This argument misses the point:  I understand Plaintiffs to allege that the milestones were not met,

---

[128] In July of 2022, 777 Partners sent a Schedule K-1 to MALT, which indicated it had a 5% interest in Phoenicia at the beginning of 2021, which was reduced to a 3% interest at the end of 2021.  Defendants concede that the K-1 was mistaken, and that it should have stated 777 Partners held a 6% interest.  DOB 22 & n.12.  The undisputed 6% interest comprises the 3% immediately vested interest, 3% interest that vested over three years, and 1% from the satisfaction of the first and second milestones, minus 1% because the Employment Agreement was terminated within four years of signing.  To be sure, the Amended Complaint does not mention termination of the Employment Agreement, and so that termination would typically fall outside the scope of this motion.  But MALT did not address the issue in briefing or at oral argument, and does not appear to contest this point.  For purposes of this motion, I conclude that MALT forfeited that 1% interest.

[129] DOB 31.

but should have been met, and would have been met, if the Jet Leasing Business had been operated within Phoenicia.

Defendants also seek dismissal on the grounds that Section 3.1 of the Operating Agreement did not require them to operate the Jet Leasing Business through Phoenicia. Here, as explained, I agree with Defendants. Any obligation to operate the Jet Leasing Business through Phoenicia is not founded in Section 3.1. But Plaintiffs also contend that running the Jet Leasing Business outside of Phoenicia breached the Operating Agreement's implied covenant and the 777 Defendants' fiduciary duties. If Plaintiffs prevail on those claims, there may be grist for Count III. Count III is not dismissed.

As to Count IX, because Count IX seeks a declaratory judgment that MALT owns 8%, and because MALT conceded it is entitled to, at most, 7% because the Employment Agreement was terminated within four years, Count IX is dismissed.

## III. CONCLUSION

The motion to dismiss is GRANTED as to Counts II, IV, VII, and IX. The motion is GRANTED IN PART as to Counts I, V, and X. The motion is DENIED as to Counts III and VI.[130]

---

[130] Plaintiffs withdrew Count VIII. PAB 43–44 ("Defendants also challenge the Eighth Cause of Action, which seeks a declaratory judgment that the guarantee given by 777 Partners in the [SPA] has been triggered. Plaintiffs hereby withdraw that cause of action." (citation omitted)).